## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                   Case No. 19-CR-0079 MV

STEVEN MIRABAL,

        Defendants.

### <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Defendant Steven Mirabal's Opposed Motion to Suppress Statements and Opposed Motion to Suppress Illegal Search.  Docs. 37 and 38.  The government filed a response [Doc. 46] and Mr. Mirabal filed a reply [Doc. 47].  The Court then held an evidentiary hearing on the motions on September 4, 2020 and received supplemental briefing from the parties [Docs. 65 and 66].  Having considered the briefs, exhibits, witness testimony, relevant law, and being otherwise fully informed, the Court finds that Mr. Mirabal's Opposed Motion to Suppress Statements [Doc. 37] is well-taken in part and will be **GRANTED IN PART**.  It further finds that his Opposed Motion to Suppress Illegal Search [Doc. 38] is not well-taken and will be **DENIED**.

### BACKGROUND

Mr. Mirabal is charged with one count of Felon in Possession of a Firearm and Ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924.  Doc. 50.  At issue in this opinion is whether his Fourth Amendment rights were violated when three New Mexico State Probation and Parole Officers (PPOs) searched his apartment pursuant to the search conditions in his orders of probation and parole after receiving a tip that he was in possession of firearms and was possibly selling drugs.  Because Mr. Mirabal made inculpatory statements to a Special Agent (SA) with the

1

Federal Bureau of Investigations (FBI) who was present during the search, the Court must also determine whether his Fifth Amendment rights were violated.   The following represents the Court's findings of fact, based on the evidence submitted by the parties and the testimony presented at the September 4, 2020 hearing.[1]

## I.   Facts

In April 2018, PPO Tommy Weaver was assigned to supervise Mr. Mirabal, who was on New Mexico state probation and parole as a result of several prior convictions.   Doc. 61 at 6:10–15, 11:11 (Transcript of September 4, 2020 Evidentiary Hearing).   Probation and parole considered Mr. Mirabal a "high-risk offender" because of the nature of his prior convictions, his possible gang affiliation, and the fact that he had just served a term of imprisonment on a parole violation he committed the previous year.   *Id*. at 7:03–07.   Mr. Mirabal was being supervised by PPO David Dresp at the time of the violation, and PPO Dresp told another probation and parole officer who testified at the September 4, 2020 hearing, PPO Eric Nagel, that the violation involved Mr. Mirabal speaking to an individual in custody about the "purchasing or selling of firearms."   *Id*. at 107:15–17.   More specifically, Mr. Mirabal told the person in custody that he had a few AR rifles and an AK-47 for sale (according to a report filled out by PPO Weaver after the events of this case).   Gov't

---

[1] When ruling on a motion to suppress, the Court must state its essential findings on the record.   *See* Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record.").   This Memorandum Opinion and Order's findings of fact shall serve as the Court's essential findings for Rule 12(d)'s purposes.   The Court makes these findings under the authority of Rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to search.   *See United States v. Merritt,* 695 F.2d 1263, 1269–70 (10th Cir. 1982) ("[U]nder Rule[ ] 104(a) ..., the district court 'is not bound by the Rules of Evidence except those with respect to privilege.'") (quoting *United States v. Matlock*, 415 U.S. 164, 174 (1974)).   In deciding such preliminary questions, the other rules of evidence, except those with respect to privilege, do not bind the Court.   *See* Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible.   In so deciding, the court is not bound by evidence rules, except those on privilege.").

Ex. 13 at 2.  It does not appear that any firearms were actually recovered from Mr. Mirabal in connection with the violation, however.  Hearing Tr. at 47:07–19.

When PPO Weaver began his supervision of Mr. Mirabal in April 2018, he was living with his parents in Albuquerque.  *Id*. at 8:25–9:03.  That July, he moved with his wife, Victoria Garcia, to an apartment to avoid the drinking that was happening at his parents' home.  *Id*. at 9:09–25.  A rental agreement admitted into evidence as Defendant's Exhibit D shows that the lease began on July 18, 2018 and that it was under Ms. Garcia's name.  *See* Def. Ex. D.  She testified that Mr. Mirabal did not fully move into the apartment until a few days before the events of this case, however.  Hearing Tr. at 167:15–17.  When PPO Weaver first visited the apartment, he confiscated a "training weapon" that Mr. Mirabal said was a toy for his child.  *Id*. at 10:16–20.  PPO Weaver described the training weapon as an "exact replica" of a Glock model handgun with the look, weight, and feel of a real gun other than the color, which was orange with "gold or silver paint."  *Id*. at 10:23–11:03.  PPO Weaver did not file a parole violation, but he took the training weapon and told Mr. Mirabal he could not have anything like it in the future.  *Id*. at 11:08–09.

Then, on August 3, 2018, PPO Weaver received an email from another New Mexico state PPO, Patrick Martinez, stating that one of PPO Martinez's probationers told him that "Steve Mirabal had a firearm and possibly was selling narcotics."  *Id*. at 11:12–19.  PPO Martinez did not tell PPO Weaver the name of the person who provided the tip because he "didn't want his name out there."  *Id*. at 12:02–03.  PPO Weaver nevertheless believed that the tip was credible because PPO Martinez knew the identity of the tipster and because the tipster was not receiving any benefits, such as money or time off their sentence, for providing the information.  *Id*. at 12:03–14.  PPO Martinez also communicated the tip to PPO Nagel, who testified that PPO Martinez "stopped [him] in the hall" and stated that "somebody who [PPO Martinez] was supervising had told him

[that PPO Weaver's] probationer was possibly selling narcotics and [was] in possession of firearms." *Id*. at 102:16–19.  As with PPO Weaver, PPO Martinez declined to tell PPO Nagel the identity of the probationer who provided the tip because they preferred "not to be known."  *Id*. at 103:04–05.

PPO Weaver testified that after he received the tip from PPO Martinez, he "looked into Mr. Mirabal a little closer."  *Id*. at 13:16.  He found that Mr. Mirabal had a prior conviction for aggravated battery with a deadly weapon and that he was a "self-admitted 14th Street gang member," as well as a possible member of the Burqueños gang. *Id*. at 13:17–20.  After considering the information that Mr. Mirabal, a possible gang member with a violent history, was in possession of firearms and was possibly selling drugs, PPO Weaver concluded that the situation was "pretty dangerous" and posed a potential "danger to the public."  *Id*. at 14:20–24.  He accordingly spoke to PPO Nagel and a supervisor in the office about conducting a search of Mr. Mirabal's apartment to investigate the tip.  *Id*. at 14:25–15:03, 57:15–18.

Importantly, the PPOs had a source of authority to support the proposed search: the orders of probation and parole with which Mr. Mirabal was required to comply and which he had signed on February 5, 2018.  *See* Gov't Ex. 1.  Both orders have a condition requiring Mr. Mirabal to submit to searches of his residence and property if certain conditions are met.  *Id.*  Mr. Mirabal's order of probation states: "I will permit any Probation/Parole Officer to visit me at my home or place of employment at any time.  I will permit a warrant-less search by the Officer of my person, automobile, residence, property and/or living quarters if he/she has reasonable cause to believe the search will produce evidence of a violation of my conditions of probation."  *Id*. at 5.  Mr. Mirabal's order of parole similarly states: "I will permit my Parole Officer or Corrections Officials to visit me at all reasonable times, places, and will submit to reasonable warrantless searches per New

Mexico Corrections Department policy." *Id.* at 3.   The relevant New Mexico Corrections Department (NMCD) policy allows probation and parole officers to conduct a search "when there is a reasonable suspicion to believe that the offender is in possession of prohibited items, or that there is a reasonable suspicion that a violation of his or her conditions has occurred."  Hearing Tr. at 79:21–80:02.  Under the policy, officers "must seek corroborating evidence before conducting an actual search."  *Id.* at 80:04–06.  Mr. Mirabal's orders of probation and parole also prohibit him from possessing any controlled substances or weapons.  *See* Gov't Ex. 1 at 2, 6.

Because the PPOs learned about the tip on a Friday, they decided to search Mr. Mirabal's apartment the following Monday.  Hearing Tr. at 15:06–09.  In the meantime, PPO Nagel was "going to get some police backup" for the search.  *Id.* at 15:05.  He testified that doing so was common because if a probation search revealed evidence of a new criminal offense, another law enforcement agency would have to write the criminal charges for that offense.  *Id.* at 110:09–14. Because many PPOs including PPO Weaver were unarmed, probation and parole also commonly sought backup from armed officers with other agencies.  *Id.* at 111:04–08.  PPO Nagel accordingly contacted FBI SA Joseph Sainato and asked him to join for the search of Mr. Mirabal's apartment. *Id.* at 138:25–139:11.  In addition to the reasons listed above, PPO Nagel asked SA Sainato to be present for the search because SA Sainato was conducting an investigation into the Burqueños, one of the gangs with which Mr. Mirabal was possibly affiliated.  *Id.* at 139:18–20.

At approximately 8:55 or 9:00 a.m. on the morning of Monday, August 6, 2018, PPO Weaver, PPO Nagel, and SA Sainato met outside of Mr. Mirabal's apartment.  *Id.* at 17:08–11, 31:22–24.  PPO Weaver's supervisor, PPO Michael Hallberg, was also present.[2]  *Id.* at 17:08–11,

---

[2] The government was planning to call PPO Hallberg to testify at the September 4, 2020 hearing, but he did not appear because he was placed on administrative leave shortly before the hearing for reasons that remain unknown.  In supplemental briefs filed after the hearing, the parties ask the Court to rule on the motions to suppress on the current record with the possibility of reconsideration if relevant information later comes

26:19–20.  PPO Weaver knocked on the door to the apartment, but no one answered.  *Id*. at 18:24–25.  After a few minutes, he placed a call to one of the phone numbers he had listed for Mr. Mirabal. *Id*. at 20:02–08.  Mr. Mirabal did not answer, so PPO Weaver left a message.[3]  *Id*.  PPO Nagel then knocked on the door for what PPO Weaver described as an additional "three to five minutes." *Id*. at 21:24–25.  At that point, PPO Weaver became concerned about what was going on inside the apartment because he believed Mr. Mirabal was home based on the fact that there was a vehicle parked in front of the apartment and because Mr. Mirabal was not working at the time.  *Id*. at 22:09–16.

After approximately five to ten minutes, Mr. Mirabal's wife, Ms. Garcia, opened the door. *Id*. at 22:18–19, 32:02.  PPO Weaver explained that he was Mr. Mirabal's probation officer and they were there for a home visit.  *Id*. at 22:21–24.  Ms. Garcia then let the officers in and told them that Mr. Mirabal was upstairs in bed.  *Id*. at 22:24–23:08.  PPO Weaver and PPO Nagel went upstairs and entered Mr. Mirabal's bedroom, where he was lying in bed.  *Id*.  at 23:25–24:01.  PPO Nagel then asked Mr. Mirabal to get out of bed, handcuffed him for officer safety reasons, and escorted him downstairs.  *Id*. at 24:02–18.  He was placed in the same room as Ms. Garcia, but on the opposite side of the room.  *Id*. at 125:14–15.  PPO Nagel told Mr. Mirabal that he was being detained while they searched the apartment and asked him and Ms. Garcia not to speak to one another.  *Id*. at 125:16–20.

---

out about PPO Hallberg and his role in this case.  *See* Doc. 65 at 11–12, Doc. 66  at 1.

[3] PPO Weaver testified that although he believed he called the number he had listed for Mr. Mirabal, he could not be sure because Mr. Mirabal had three or four numbers.  Hearing Tr. at 20:14–21:07.  Ms. Garcia later testified that she did not have any missed calls on her phone, which was one of the phones that Mr. Mirabal used to communicate with probation, and Defendant's Exhibit C, an extraction report from the phone, does not show any missed calls on the morning of August 3, 2018.  *Id*. at 173:08–174:02; *see also* Def. Ex. C.

PPO Weaver testified that he stayed in the bedroom and began to look around. *Id*. at 24:22–25.   On the top shelf of a bedroom closet, he saw "several items that are typically used for marijuana use," including three glass pipes, a container with a marijuana leaf on it, and another container with a "medical symbol" on it. *Id*. at 25:01–06. Ms. Garcia testified that the marijuana was hers and that she had a medical marijuana card allowing her to legally possess it. *Id*. at 171:18–24.   She also testified that Mr. Mirabal told her that he had let PPO Weaver know about the marijuana at the time they moved into the new apartment. *Id*. at 171:25 –172:16.   PPO Weaver testified that Mr. Mirabal never told him about a medical marijuana card, however, and that he would have remembered such a statement because he would have made a note of it. *Id*. at 60:25–61:06.

As PPO Weaver looked around the upstairs bedroom, PPO Hallberg began to search downstairs. *Id*. at 126:02.   At some point, he found a backpack with a gun cleaning kit and ammunition in a closet. *Id*. at 126:2–22.   Mr. Mirabal's stepfather, Brian Fulbright, testified that the backpack belonged to him and he accidentally left it at the apartment the weekend before the search took place. *Id*. at 194:3–195:23.   He was at a shooting range and went to the apartment to help Mr. Mirabal move some furniture. *Id*. at 195:10–14.   When he left the apartment later that day, he forgot the backpack. *Id*. at 195:15–18.

After PPO Hallberg found the backpack with the ammunition, PPO Nagel asked Mr. Mirabal and Ms. Garcia if there was a firearm in the home. *Id*. at 127:9–13.   Ms. Garcia testified that she responded that there was a gun under the mattress upstairs. *Id*. at 170:19–21.   She continued that the gun belonged to her and she kept it for safety reasons. *Id*. at 174:4–7.   PPO Nagel testified that he was standing next to Ms. Garcia and heard her make the statement. *Id*. at 127:16–17.   Although PPO Weaver could not hear much of what was being discussed downstairs,

7

he also testified that he clearly heard Ms. Garcia say "the gun was in the bed" because she was seated at the end of the couch "right next to the stairwell."  *Id*. at 25:14–15.  As for Mr. Mirabal, PPO Nagel testified that he did not recall him "saying anything about the firearm" or "providing [the PPOs] any information to where a weapon was at."  *Id*. at 126:16–25, 127:16.  In a probation violation report completed by PPO Weaver the next day, however, PPO Weaver wrote that before Ms. Garcia made the statement about the gun being under the mattress, Mr. Mirabal "reported that there may be a firearm in the home."  Gov't Ex. 13 at 2.  PPO Hallberg also wrote in his incident report that it was Mr. Mirabal, rather than Ms. Garcia, who said that there was a gun under the mattress upstairs.  Hearing. Tr. at 74:11–17.

    After PPO Weaver heard Ms. Garcia say that there was a gun in the bed, he searched the bed but found nothing there.  *Id*. at 26:01–07.  He then returned to the closet, where he saw a purse hanging from a "protrusion" attached to a shelf.  *Id*. at 26:06–07, 85:04–15.  Because the purse was hanging by both handles, it was closed and PPO Weaver could not initially see inside of it.  *Id*. at 85:16–25.  He then lifted one of the purse handles and looked inside, at which point he saw the handle of a firearm.  *Id*. at 26:09–11.  PPO Weaver did not have firearms training, so SA Sainato came upstairs and cleared the weapon, a .45 caliber handgun, by removing the magazine and ejecting a live round from the chamber.  *Id*. at 26:16–17, 143:01–19.  The government introduced pictures of the purse and the recovered firearm at the September 4 evidentiary hearing as Government's Exhibits 4 and 8.  *See* Gov't Exs. 4 and 8.  PPO Weaver then continued to search the bedroom and found a handgun holster and pocketknives in dresser drawer, a gun cleaning kit and more pocketknives in backpack in a hall closet, and brass knuckles and another pocketknife in the purse in which the gun was discovered.  Hearing Tr. at 28:24–29:06.

PPO Weaver additionally testified that when PPO Nagel initially escorted Mr. Mirabal downstairs, there was a phone that PPO Nagel took with him. *Id*. at 24:18–20, 72:14–16. PPO Nagel testified that he could not remember who handed him the phone but that after the ammunition and firearm were found he went through it to look for "further evidence of violations." *Id*. at 117:03–10. When the Court later asked PPO Nagel how he got into the phone, he testified that it was "unlocked at the time" and that he "didn't have to do anything special to get into it" and "didn't ask" to have it unlocked. *Id*. at 134:14–135:02. Ms. Garcia testified, however, that she unlocked the phone because "[o]ne of the officers told [her] to" do so. *Id*. at 172:20. She further testified that she didn't think she had a choice but to comply because the officer told her that since Mr. Mirabal used the phone to check in with probation, it was "pretty much his phone, so they [had] the right to go through it." *Id*. at 172:23–173:05. Upon searching the phone, PPO Nagel found two photographs of Mr. Mirabal holding a black handgun. *Id*. at 117:24–118:02. One of the photographs, admitted into evidence as Government's Exhibit 2, shows Mr. Mirabal holding the gun, pointing up, along the side of his face. Gov't Ex. 2. The other photograph, admitted as Government's Exhibit 3, shows Mr. Mirabal pointing the barrel of the gun directly at the camera. Gov't Ex. 3. PPO Nagel and SA Sainato testified that the handgun in the photographs appeared to match the handgun PPO Weaver found in the purse in the upstairs bedroom. *Id*. at 118:03–05, 144:14–15.

SA Sainato testified that after PPO Nagel showed him the photographs on the phone, he and Mr. Mirabal sat down at the dining room table in the apartment. *Id*. at 144:18–19. SA Sainato gave Mr. Mirabal the *Miranda* warnings, which he waived and agreed to give a statement. *Id*. at 149:22–24. Mr. Mirabal then stated that the firearm found upstairs belonged to Ms. Garcia and the ammunition found in the backpack downstairs belonged to his "father." *Id*. at 147:01–16. He

9

also admitted to taking the photographs on the phone and stated that "it had been a long time since he'd held a firearm." *Id*. at 147:25–148:02.  Finally, SA Sainato testified that Mr. Mirabal said he was "no longer a Burqueños gang member, and he had actually been assaulted by some Burqueños gang members before he was released from prison."  *Id*. at 146:19–22.  SA Sainato described the interview as "fairly, fairly brief" and testified that he did not ask Mr. Mirabal any questions prior to reading him his *Miranda* rights.  *Id*. at 150:03–06.  At some point during or after the interview, PPO Nagel asked Ms. Garcia if he could search the vehicle that was parked outside of the apartment.  *Id*. at 119:06.  Ms. Garcia agreed and opened the door, at which point PPO Nagel searched the vehicle and found a single round of ammunition.  *Id*. at 118:22–119:08.  Ms. Garcia testified that the vehicle belonged to her and that Mr. Mirabal did not drive or have access to it. *Id*. at 178:10–18.

Once SA Sainato's interview with Mr. Mirabal was over, he was arrested for violating his conditions of probation.  *Id*. at 145:23.  PPO Hallberg had also called a detective from the Bernalillo County Sheriff's Office (BCSO) during the search and BCSO deputies arrived and took custody of the evidence that the PPOs had discovered.  *Id*. at 145:16–25.  PPO Weaver testified that the search of the apartment took a total of 15 to 20 minutes and that the PPOs were at the apartment no more than 45 minutes overall.  *Id*. at 32:05–09.

## II.    Procedural Background

On January 10, 2019, Mr. Mirabal was charged by indictment with one count of Felon in Possession of a Firearm and Ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924.  Doc. 2. He pled not guilty at an arraignment held on February 1, 2019.  Doc. 12.  On February 7, 2020, Mr. Mirabal filed the instant motions to suppress.  Docs. 37 and 38.  In his Motion to Suppress Illegal Search, he asks the Court to suppress any and all evidence recovered from the search of his

apartment and cell phone on August 6, 2018 because the PPOs did not have reasonable suspicion to support the search as required by his orders of probation and parole. *See generally* Doc. 38. And in his Motion to Suppress Statements, he asks the Court to suppress any statement he made after he was placed in handcuffs, both to the PPOs and to SA Sainato, on the grounds of voluntariness and his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). *See generally* Doc. 37; *see also* Doc. 47 at 4–9. The government responds that the search of Mr. Mirabal's apartment was supported by reasonable suspicion and that his statements were "knowingly made" and satisfy *Miranda*. *See generally* Doc. 43. The Court held an evidentiary hearing on Mr. Mirabal's motions on September 4, 2020, at which it heard testimony from PPO Weaver, PPO Nagel, SA Sainato, Ms. Garcia, and Mr. Fulbright. Doc. 59. It then received supplemental briefs from the parties on October 20, 2020 which state that the motions are ready for decision. *See* Docs. 65 and 66.

## DISCUSSION

The Court has now reviewed the parties' briefs, the testimony and exhibits presented at the September 4 evidentiary hearing, and the relevant Fourth and Fifth Amendment law. For the reasons explained below, it finds that the PPOs had reasonable suspicion to search Mr. Mirabal's apartment and phone on August 6, 2018 pursuant to the search conditions in his orders of probation and parole. As a result, the search did not violate Mr. Mirabal's Fourth Amendment rights and the physical evidence the PPOs discovered will not be suppressed. The Court also finds that Mr. Mirabal's detention in handcuffs during the search did not violate his Fourth Amendment rights. With regard to Mr. Mirabal's statements, the Court finds that because he spoke to SA Sainato voluntarily after being given his *Miranda* warnings, his statements to SA Sainato can be admitted without violating his Fifth Amendment right against self-incrimination or the Due Process Clause. Any earlier unwarned statements Mr. Mirabal made in response to officer questioning will be

suppressed, however, because he was in custody for the purposes of *Miranda* at that time and the public safety exception to the *Miranda* rule does not apply.

## I.      Fourth Amendment Standing

As a threshold matter, Mr. Mirabal argues that he has Fourth Amendment standing to object to the PPOs' search of the apartment.  Doc. 38 at 3–4.  The government does not address this issue in its briefs.  The concept of Fourth Amendment standing is somewhat of a misnomer because it does not refer to standing in a jurisdictional sense, *see United States v. Johnson*, 584 F.3d 995, 999 n.3 (10th Cir. 2009); rather, it refers to the important principle that a defendant "may only claim the benefits of the exclusionary rule if their *own* Fourth Amendment rights have in fact been violated."  *United Staves v. Salvucci*, 448 U.S. 83, 85 (1980) (emphasis added).  The critical question is whether Mr. Mirabal "manifested a subjective expectation of privacy in the area searched and whether society is prepared to recognize that expectation as objectively reasonable." *United States v. Erwin*, 875 F.3d 268. 270 (10th Cir. 1989) (citing *California v. Greenwood*, 468 U.S. 35 (1988)).

With regard to the apartment, the answer is clearly yes.  Although Ms. Garcia's name was on the lease, Mr. Mirabal manifested a subjective expectation of privacy in the apartment by telling PPO Weaver that it was going to be his new place of residence and moving in several days before the search took place.  *See* Hearing Tr. at 9:09–25, 167:15–17.  Mr. Mirabal's expectation of privacy in the apartment is also one that society is prepared to recognize as objectively reasonable because he was living there and "when it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 5 (2013).  Finally, even if the apartment was not yet Mr. Mirabal's home when the search took place, the fact that he slept there the night before the search gives him standing to object to the search on Fourth Amendment grounds.  *See Minnesota v. Olson*,

495 U.S. 91, 98 (1990) (holding that "an overnight guest has a legitimate expectation of privacy in his host's home").

Whether Mr. Mirabal has Fourth Amendment standing to object to PPO Nagel's search of the phone is a harder question. On the one hand, Ms. Garcia testified that Mr. Mirabal had access to it and used it to contact probation. Hearing. Tr. at 187:04–08. He also manifested a subjective expectation of privacy in the phone by using it to take the pictures of himself holding the handgun. *Id*. at 147:25–148:02. On the other hand, Ms. Garcia testified that the phone was hers and she was the person to unlock it for PPO Nagel. *Id*. at 172:20, 187:19–21. On the current record, it is hard to tell whether Mr. Mirabal's use of the phone was extensive enough to give him a reasonable expectation of privacy in it. Ultimately, the Court need not decide this question because it believes that PPO Nagel's search of the phone was lawful even assuming Mr. Mirabal has Fourth Amendment standing to challenge it.

## II.     Whether the PPOs Had Reasonable Suspicion to Support the Search

On the merits, Mr. Mirabal first argues that the PPOs' search of the apartment and phone violated his Fourth Amendment rights. As the Tenth Circuit has explained, there are two ways to evaluate the reasonableness of a warrantless probation search. *Leatherwood v. Welker*, 757 F.3d 1115, 1120 (10th Cir. 2014). Under the "special needs exception" articulated by the Supreme Court in *Griffin v. Wisconsin*, 483 U.S. 868 (1987), a probation search satisfies the Fourth Amendment if it is carried out "pursuant to a state law which itself satisfies the Fourth Amendment's reasonableness requirement." *Leatherwood*, 757 F.3d at 1120 (citations omitted). And under the "totality-of-the-circumstances exception" articulated by the Supreme Court in *United States v. Knights*, 534 U.S. 112 (2001), courts evaluate the reasonableness of a probation search under general Fourth Amendment principles. *Leatherwood*, 757 F.3d at 1120. Probationers

13

do not enjoy the same level of Fourth Amendment protection as everyone else, however, because "probation search conditions considerably diminish the probationer's reasonable expectation of privacy." *Id.* (citing *Knights*, 534 U.S. at 119–20).

Applying *Griffin*'s special needs rationale, the PPOs' search was legal if it was carried out pursuant to Mr. Mirabal's orders of probation and parole and if the orders themselves are reasonable under the Fourth Amendment. Taking up the second issue first, Mr. Mirabal's orders of probation and parole are reasonable under the Fourth Amendment because the Supreme Court has upheld far more intrusive policies. In *Samson v. California*, 547 U.S. 843 (2006), for example, the Supreme Court upheld as constitutional a California law that allowed parolees to be searched or seized "at any time of the day or night, with or without a search warrant and *with or without cause*." *Id.* at 846 (emphasis added). In holding that the suspicion-less search provision was constitutional, the Court pointed to the state's "substantial interest" in reducing recidivism among probationers and parolees as well as the fact that people on parole have even fewer expectations of privacy than those on probation because "parole is more akin to imprisonment than probation is to imprisonment." *Id.* at 850, 853.

Here, Mr. Mirabal's orders of probation and parole are less intrusive than the California law upheld in *Samson* because they require the PPOs to suspect wrongdoing before conducting a search. Specifically, Mr. Mirabal's order of probation requires "reasonable cause to believe the search will produce evidence of a violation of [his] conditions of probation." Gov't Ex. 1 at 5. His order of parole similarly requires "reasonable suspicion to believe that the offender is in possession of prohibited items, or that there is a reasonable suspicion that a violation of his or her conditions has occurred." Hearing Tr. at 79:21–80:02. Because these search conditions are more narrowly tailored than the search condition upheld in *Samson*, Mr. Mirabal's orders of probation

14

and parole "satisf[y] the Fourth Amendment's reasonableness requirement." *Leatherwood*, 757 F.3d at 1120.

The pertinent question then becomes whether the PPOs had reasonable suspicion to believe that their search of Mr. Mirabal's apartment and phone would turn up evidence of prohibited items or some other violation of his conditions of probation or parole.[4]   Reasonable suspicion is "a particularized and objective basis for suspecting criminal activity." *Leatherwood*, 757 F.3d at 1120.  Courts assessing whether reasonable suspicion existed consider "both the quantity of the information possessed by law enforcement and its reliability, viewing both factors under the totality of the circumstances." *Id.*

Mr. Mirabal argues that the PPOs lacked reasonable suspicion to support the search because it was based on an anonymous tip that was "relayed through levels of hearsay without any indication that follow up was done to identify the truthfulness/veracity of the tip."  Doc. 38 at 5. He also argues that even if the search was justified at its inception, it became unreasonable when the PPOs initially failed to find anything incriminating.  *Id.* at 6.  In response, the government argues that a number of factors gave rise to reasonable suspicion justifying the search, including the tip that PPO Martinez received; the fact that Mr. Mirabal violated his probation in 2017 after he was "overheard telephonically discussing the sale of A.R. rifles and an AR 47"; the fact that PPO Weaver recovered the training gun from Mr. Mirabal's residence the month before the search; and the fact that nobody initially answered the door when the PPOs knocked on it the morning of the search and Mr. Mirabal did not answer the phone when PPO Weaver called him.  Doc. 43 at 6.  The government further argues that the tip was not truly "anonymous" because the identity of

---

[4] In *State v. Baca*, 2004-NMCA-049, 135 N.M. 490 (N.M. Ct. App. 2004), the New Mexico Court of Appeals clarified that the term "reasonable cause" in New Mexico orders of probation has the same meaning as the term "reasonable suspicion."  *Id.* at 502–03.

the tipster was known to PPO Martinez and should be imputed to the other PPOs under the "collective knowledge" doctrine. *Id*. at 7 (citing *United States v. Chavez*, 534 F.3d 1338, 1345–48 (10th Cir. 2008). Finally, the government argues that Ms. Garcia's statement that there was "a gun under the mattress" gave the PPOs further suspicion to continue their search. Doc. 43 at 7.

The Court finds that, under the totality of the circumstances, the PPOs had reasonable suspicion to believe that a search of Mr. Mirabal's apartment would turn up evidence of a violation of his probation or parole. First, and most importantly, they had the tip from the probationer overseen by PPO Martinez that Mr. Mirabal "had a firearm and possibly was selling narcotics," *Id*. at 11:12–19, both of which would have been violations of his conditions of probation and parole. While it is true that in general anonymous tips must be corroborated and must bear "sufficient indicia of reliability" to support reasonable suspicion, *Florida v. J.L.*, 529 U.S. 266, 270 (2000), the Court agrees with the government that the tip here was not truly anonymous because PPO Martinez knew the identity of the person who supplied it. Doc. 43 at 7. As the Tenth Circuit explained in *United States v. Chavez*, courts have recognized the concept of "vertical collective knowledge" where "one officer has probable cause and instructs another officer to act, but does not communicate the corpus of information known to the first officer that would justify the action." 534 F.3d 1338, 1345 (10th Cir. 2008). The most prominent example comes from *United States v. Hensley*, 469 U.S. 221 (1985), where the Supreme Court noted that "when evidence is uncovered during a search incident to an arrest in reliance merely on a flyer or bulletin, its admissibility turns on whether the officers who *issued* the flyer possessed probable cause to make the arrest." *Id*. at 231 (emphasis in original). The situation here is similar because while

PPO Weaver and Nagel did not know the identity of the person who provided the tip, the person who passed it along to them—PPO Martinez—did.[5]

In any event, PPO Weaver testified that he did investigate the reliability of the tip and attempt to corroborate it by "look[ing] into Mr. Mirabal a little closer," at which point he saw Mr. Mirabal's prior conviction for aggravated battery with a deadly weapon and that he was a "self-admitted 14th Street gang member" as well as a possible member of the Burqueños gang.  Hearing Tr. at 13:16–20.  Critically, PPO Weaver and PPO Nagel also knew from Mr. Mirabal's file and from PPO David Dresp that Mr. Mirabal had violated his parole the previous year for associating with someone he was not supposed to and telling that individual over the phone that he had a few AR rifles and an AK-47 for sale.  *Id.* at 107:15–17; *see also* Gov't Ex. 13 at 2.  The Court believes that this information, taken together, corroborated the tip and gave rise to reasonable suspicion that Mr. Mirabal was in possession of a firearm in August 2018, which in turn justified the search of his apartment pursuant to his orders of probation and parole.[6]

Nor does the Court believe that the PPOs' legal justification diminished or disappeared during the search, as Mr. Mirabal suggests.  Doc. 38 at 6.  First, Mr. Mirabal's order of probation gave the PPOs broad authority because it authorized them to search his "person, automobile, residence, property and/or living quarters" upon reasonable suspicion.  Gov't Ex. 1 at 5.  Second,

---

[5] The caselaw also makes clear that probation searches may be premised on less reliable information than that which is required in other contexts.  *Leatherwood*, 757 F.3d at 1121.  In *Griffin*, for example, the Supreme Court approved a tip that came from a police officer but "relayed hearsay information from an unidentified third party, was uncorroborated, and asserted only the possible existence of a violation.  *Id.* Further, in *United States v. Tucker*, 305 F.3d 1193 (10th Cir. 2002), the Tenth Circuit approved an uncorroborated tip from a known citizen-informant relaying information from anonymous sources who allegedly had been in the defendant's home and witnessed the violation.  *Id.*  And the Tenth Circuit has also "approved of probation searches based on anonymous or vague tips in other cases."  *Id.* (citations omitted).

[6] Because of the relatively early hour at which the PPOs were knocking on the door to Mr. Mirabal's apartment, the Court is less persuaded that his failure to immediately come to the door or answer his phone was inherently suspicious.

the evidence in the record shows that the amount of reasonable suspicion justifying the search only grew as the search progressed.  PPO Nagel's testimony indicates that PPO Hallberg found the backpack with the ammunition and gun cleaning kit within minutes of the search commencing. *See* Hearing Tr. at 127:20–128:01.  Shortly thereafter, Ms. Garcia made the statement that there was a gun under the mattress upstairs, which led PPO Weaver to find the handgun in her purse near where he had previously noticed the marijuana paraphernalia.  *See supra* at 6–8.  Given the PPOs' discovery of the handgun, ammunition, and drug paraphernalia, by the time PPO Nagel searched the phone, he had reasonable suspicion to believe that searching it would turn up additional evidence of guns and/or drugs.[7]  On the whole, the PPOs' search was supported by reasonable suspicion from its inception to its conclusion, making it lawful under Mr. Mirabal's orders of probation and parole as well as the Fourth Amendment.

### III.     Whether Mr. Mirabal's Detention During the Search Violated the Fourth Amendment

Although the parties only briefly addressed it in their filings, another issue is whether Mr. Mirabal's detention in handcuffs during the search violated his Fourth Amendment rights.  If so, any statements he made during the illegal detention or any evidence discovered as a result would have to be suppressed as fruit of the poisonous tree.  *See Wong Sun v. United States*, 371 U.S. 471 (1963); *Brown v. Illinois*, 422 U.S. 590 (1975).  For the reasons explained below, the Court finds that Mr. Mirabal's detention for officer safety reasons was reasonable and did not violate the Fourth Amendment as it has been interpreted in the caselaw.

---

[7] To the extent that one could argue the phone was in fact Ms. Garcia's property and the PPOs did not have the authority to search it under Mr. Mirabal's orders of probation and parole, Mr. Mirabal would lose the ability to challenge the search on Fourth Amendment grounds because defendants "may only claim the benefits of the exclusionary rule if their *own* Fourth Amendment rights have in fact been violated."  *See Salvucci*, 448 U.S. at 85 (emphasis added).

"The Supreme Court has recognized three types of police-citizen encounters: (1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause." *United States v. White*, 584 F.3d 935, 944 (10th Cir. 2009) (citations and internal quotations omitted). "These categories are not static and may escalate from one to another." *Id.* Accordingly, a reviewing court must analyze each stage of the police-citizen encounter, ensuring that the requisite level of suspicion or cause is present at each stage." *Id.*

An arrest is distinguished from an investigative *Terry* stop by the "involuntary, highly intrusive nature of the encounter." *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007). For example, "the use of firearms, handcuffs, and other forceful techniques generally exceed the scope of an investigative detention and enter the realm of an arrest." *Id.* "Or an investigative detention may last too long under the specific circumstances of a given case and on that basis may be transformed into a de facto arrest." *White*, 584 F.3d at 953. However, because "reasonableness" is the touchstone of Fourth Amendment analysis, "the partition between investigative detentions and de facto arrests cannot be defined by any litmus-paper test." *Florida v. Royer*, 460 U.S. 491 (1983).

These general principles in mind, controlling Supreme Court precedent suggests that the temporary detention of an individual during the duration of a lawful search of their residence is constitutionally reasonable and does not rise to the level of a de facto arrest. The leading case on this issue is *Michigan v. Summers*, 452 U.S. 692 (1981). There, the Supreme Court held that officers executing a valid search warrant are permitted to "detain the occupants of the premises

while a proper search is conducted." *Id*. at 705.  In so holding, the Court noted that such a detention represents "only an incremental intrusion on personal liberty" beyond the search of the person's property that is already occurring pursuant to the search warrant. *Id*. at 703.  Making that additional intrusion reasonable are three important law enforcement interests: officer safety, facilitating the completion of the search, and preventing flight. *Bailey v. United States*, 568 U.S. 186, 194 (2013) (citing *Summers*, 452 U.S. at 702–03).

In *Muehler v. Mena*, 544 U.S. 93 (2005), the Supreme Court doubled down on the holding of *Summers*, holding that officers did not violate the Fourth Amendment by detaining suspects in handcuffs for two to three hours while they completed a search of their residence.  The Court additionally held that the officers' questioning of the suspects while in custody was not a separate Fourth Amendment event requiring its own justification because "mere police questioning does not constitute a seizure." *Id*. at 101 (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991)).  In *Bailey v. United States*,  however, the Court held that the *Summers* rationale did not allow police officers to move a detained individual off of the premises being searched without additional justification for doing so.  568 U.S. at 202.

Although the Supreme Court has not yet ruled on whether the rationale of *Summers* extends to justify the detention without probable cause of individuals present during a probation search rather than the execution of a search warrant, several other courts including the Ninth Circuit have found no reason to treat the contexts differently.  In *Sanchez v. Canales*, 574 F.3d 1169, 1175 (9th Cir. 2009), *rev'd on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012), the Ninth Circuit held that there is no reason to conclude that "officers may take reasonable action to secure the premises and ensure their own safety and the efficacy of the search only when the search is conducted pursuant to a search warrant but not to a probation or parole compliance check." *Id*.

at 1175 (internal quotations and citations omitted).  The Ninth Circuit continued that, to the contrary, the concerns identified by the Supreme Court in *Summers* and *Muehler* apply with equal force in the probation context, because the additional intrusion caused by the detention is still slight and the justifications for detention remain substantial.  *Id*.

The Court agrees with the reasoning of *Canales* and finds that Mr. Mirabal's temporary detention in handcuffs while the PPOs searched his apartment did not violate his Fourth Amendment rights.  574 F.3d at 1175.  Given the tip about Mr. Mirabal's illegal possession of a firearm, the PPOs had reason to take preventative measures to ensure their safety during the search. PPO Weaver also testified that the search took no longer than 15 to 20 minutes overall and that the PPOs had left the apartments within 45 minutes, far less time than the suspects in *Muehler* were detained.  544 U.S. at 93.  And while the fact that Mr. Mirabal was instructed not to speak with Ms. Garcia pushes his detention closer to a formal arrest, the Court does not believe that alone renders the detention unreasonable and a violation of the Fourth Amendment under the circumstances—especially since it appears that the officers did not place Ms. Garcia in handcuffs, giving them an officer safety reason to prevent communication between her and Mr. Mirabal during the search.

## IV.    Whether Mr. Mirabal's Statements Were Involuntary Under the Due Process Clause

In addition to asking the Court to suppress the physical evidence discovered by the PPOs, Mr. Mirabal asks the Court to suppress any statements he made while in handcuffs during or after the search.  *See generally* Doc. 37.  As grounds for suppression, he first suggests that some or all of his statements were involuntary.  *See* Doc. 66 at 10–11 (referring to an "involuntary statement that was made").  The government does not address the issue of voluntariness directly.

21

"To be admiss[i]ble, a confession must be made freely and voluntarily; it must not be extracted by threats in violation of due process or obtained by compulsion or inducement of any sort." *United States v. Young*, 964 F.3d 938, 942 (10th Cir. 2020) (quoting *Griffin v. Strong*, 983 F.2d 1540, 1542 (10th Cir. 1993)). "The central consideration in determining whether a confession has been coerced always involves this question: did the governmental conduct complained of bring about a confession not freely self-determined?" *Strong*, 983 F.2d at 1543 (internal citations and quotations omitted). That is because "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). The voluntariness inquiry is based upon the totality of the circumstances and requires consideration of both "the characteristics of the accused and the details of the interrogation." *United States v. Toles*, 297 F.3d 959, 966 (10th Cir. 2002). No single factor is determinative, and the government bears the burden of showing that a confession is voluntary by a preponderance of the evidence. *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006).

Here, the testimony presented at the evidentiary hearing establishes by at least a preponderance of the evidence that Mr. Mirabal's statements during the search, including his inculpatory statements to SA Sainato, were voluntary. Although the PPOs handcuffed Mr. Mirabal for their own safety, there is no evidence to suggest that they acted coercively or otherwise extracted a confession from him against his will using threats, inducements, or manipulation. To the contrary, the record shows that the PPOs told Mr. Mirabal *not* to speak (at least with respect to Ms. Garcia) and none of the witness who testified quoted him as saying much of anything prior to his statement to SA Sainato, the one exception being his possible statement that there "may be a firearm in the home" after the backpack with the ammunition was discovered. Gov't Ex. 13 at 2. Although that statement will be excluded under *Miranda*, as discussed below, there is no evidence

that the PPOs coerced Mr. Mirabal into making it involuntarily.  Nor does the fact that Mr. Mirabal

had just woken up when he was handcuffed and brought downstairs, and the fact that he was taking

medication for a back injury, render his statements involuntary without more.  Doc. 47 at 5.

Finally, SA Sainato's testimony that Mr. Mirabal voluntarily spoke to him after being given his

*Miranda* warnings establishes that Mr. Mirabal's statements to SA Sainato were also made

voluntarily and that their introduction would not violate his Due Process rights.

## V.      Whether Mr. Mirabal's Statements Should Be Suppressed Under *Miranda v. Arizona*

Finally, Mr. Mirabal argues that his statements to the PPOs and to SA Sainato should be

suppressed pursuant to his Fifth Amendment right against self-incrimination under *Miranda*.  Doc.

37 at 3–8.  He argues that the Court should suppress any initial unwarned statements he made in

response to the officers' questioning after he was placed in handcuffs and that it should also

suppress the statements he made to SA Sainato after being given the *Miranda* warnings because

they were tainted by his prior unwarned statements. *Id.*; *see also* Doc. 66 at 10–11.  In response,

the government argues that any unwarned statements Mr. Mirabal made before being *Mirandized*

are admissible under the public safety exception to the *Miranda* rule and that, regardless, they

should not render his post-*Miranda* statements inadmissible.  Doc. 43 at 8–9.

Under *Miranda*, statements made by suspects during custodial interrogation must be

excluded pursuant to the Fifth Amendment right against self-incrimination unless the police first

administered the eponymous *Miranda* warnings: that the suspect "has a right to remain silent, that

any statement he does make may be used as evidence against him, and that he has a right to the

presence of an attorney, either retained or appointed."  384 U.S. at 444.  A person is being

"interrogated" within the meaning of *Miranda* if they are being expressly questioned by law

enforcement or if the officers should have known that their words or actions were "reasonably

likely to elicit an incriminating response from the suspect." *United States v. Woody*, 2020 WL 3513486 (D.N.M. June 29, 2020) (unreported) (citing *Rhode Island v. Innis*, 446 U.S. 291, 299 (1980)).  Whether a person is "in custody" for the purposes of *Miranda* is an objective inquiry that looks to the circumstances surrounding the interrogation and whether, given those circumstances, a "reasonable person [would] have felt he or she was at liberty to terminate the interrogation and leave." *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011).  The ultimate inquiry is whether there was "a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Id*. (citations omitted).  However, in *United States v. Perdue*, 8 F.3d 1455 (10th Cir. 1993), the Tenth Circuit clarified that a person can be in "custody" for the purposes of *Miranda* before they have been formally arrested in the Fourth Amendment sense.  *Id.* at 1463–64 (citing *United States v. Berkemer*, 468 U.S. 420, 442 (1984)); *see also United States v. Smith*, 3 F.3d 1088, 1097 (7th Cir. 1993) ("Fifth and Sixth Amendment rights are implicated before a defendant has been arrested).  The Tenth Circuit accordingly held that a suspect who was ordered to get out of his car and forced to lay on the ground at gunpoint was in custody for the purposes of *Miranda*, even though the stop did not escalate from a *Terry* stop into a full-blown arrest.  *Perdue*, 8 F.3d at 1464.

Similarly, here, the Court finds that Mr. Mirabal was in custody for the purposes of *Miranda* when the PPOs handcuffed him, took him downstairs, and told him he could not speak to Ms. Garcia.  Although Mr. Mirabal was not formally arrested in the Fourth Amendment sense, *see supra* at 18–21, there was a "restraint on [his] freedom of movement of the degree associated with formal arrest." *J.D.B.*, 564 U.S. at 270.  PPO Nagel also testified that he told Mr. Mirabal that he was "being detained" for the duration of the search [Hearing Tr. at 125:19–20] and there were at least four law enforcement officers present in the apartment.  As a result, a reasonable

person in Mr. Mirabal's position would not have felt that they were at liberty to terminate the encounter. *J.D.B.*, 564 U.S. at 270.

The government argues that even if Mr. Mirabal was in custody, the PPOs did not need to read him the *Miranda* warnings because the public safety exception to *Miranda* applied. Doc. 43 at 9. The Court disagrees. The public safety exception comes from *New York v. Quarles*, 467 U.S. 649 (1984). In *Quarles*, police officers had located and detained a suspect in a supermarket in Queens, New York. *Id.* at 651–52. When an officer frisked the suspect, the officer discovered that he was wearing a firearm holster on his shoulder that was empty. *Id.* at 652. The officer then asked the suspect where the gun was without giving him the *Miranda* warnings, to which the suspect replied "the gun is over there" and nodded in the direction of empty cartons, where a .38 caliber revolver was subsequently recovered. *Id.* The state trial court suppressed the inculpatory statement under *Miranda* and the New York Court of Appeals affirmed. *Id.* at 653. The Supreme Court then reversed, holding that on the facts of the case "there [was] a 'public safety' exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence." *Id.* at 655. In so holding, the Court distinguished between unwarned questions that are investigatory in nature and those that are supported by an "objectively reasonable need to protect the police or the public from any immediate danger associated with the weapon." *Id.* at 659 n.8. Put another way, the holding in *Quarles* was based on an "exigency requiring immediate action by the officers beyond the normal need expeditiously to solve a serious crime." *Id.* The Tenth Circuit has subsequently adopted a two-step test to determine whether a sufficient threat to public safety exists to justify the application of the public safety exception, holding that an officer can ask unwarned questions under *Quarles* if he has reason to believe "(1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than the police might gain access

25

to that weapon an inflict harm with it." *United States v. DeJear*, 552 F.3d 1196, 1201 (10th Cir. 2009) (citations omitted).

Here, it is true that the PPOs had reason to believe that Mr. Mirabal might have, or have recently had, a firearm. *DeJear*, 552 F.3d at 1201. The government's argument fails at the next step, however, because the PPOs had no reason to believe that once Mr. Mirabal was handcuffed someone other than them could have gotten access to the firearm and inflicted harm with it. *Id*. The only people in the apartment were Mr. Mirabal, Ms. Garcia, and Ms. Garcia's daughter, and the record shows that Ms. Garcia was downstairs in the presence of PPO Nagel, PPO Hallberg, and SA Sainato for most of the search. Nor did the officers have reason to believe that Ms. Garcia would have attempted to grab a weapon and harm them. The Court therefore finds that any questions the PPOs asked Mr. Mirabal while he was initially handcuffed, including any questions about the firearm, were investigatory and do not fall under *Quarles*' public safety exception to *Miranda*. And because Mr. Mirabal was in custody at that time and had not yet been given the *Miranda* warnings, any unwarned statements he made in response to police questioning will be suppressed.[8]

Finally, Mr. Mirabal argues that his post-*Miranda* statements to SA Sainato should also be suppressed because of the taint of the unwarned statements he made immediately before. Doc. 66 at 10–11. The law in this area is somewhat unsettled. First, in *Oregon v. Elstad*, 470 U.S. 298

---

[8] The Court notes that this ruling does not apply to Ms. Garcia's statement that there was a gun under the mattress because her Fifth Amendment rights are not at issue in this case and it does not appear that she was in custody like Mr. Mirabal. Whether that statement is inadmissible hearsay is another issue not raised by the instant motions. The Court also notes that the suppression on Fifth Amendment grounds of Mr. Mirabal's unwarned statements, including his possible statement that "may be a firearm in the home," *see* Gov't Ex. 13 at 2, does not require any physical evidence discovered as a result to be suppressed because "physical evidence obtained as fruit of a voluntary statement by a defendant to a law-enforcement officer is admissible at trial regardless of whether the officer gave the defendant *Miranda* warnings." *United States v. Phillips*, 468 F.3d 1264, 1265 (10th Cir. 2006); *see also United States v. Patane*, 542 U.S. 640 (2004) (plurality).

(1985), the Supreme Court held that when a suspect makes voluntary but unwarned statements, is given the *Miranda* warnings, and then makes a second, warned confession, the second statements should come in as long as they are themselves voluntary under the circumstances. *Id*. at 318. The Supreme Court then revisited the issue in *Missouri v. Seibert*, 542 U.S. 600 (2004) (plurality) due to concerns that the police were strategically using successive confessions, the first unwarned and the second warned, to get around the protective intent of the *Miranda* warnings. A plurality of the Court held that courts evaluating such a situation should consider a number of factors to determine whether the warned statements should be admitted, including the completeness and detail of the questions and answers in the first round of interrogation; the overlapping content of the two statements; timing and setting of the first and the second statements; the continuity of police personnel; and the degree to which the interrogator's questions treated the second round as continuous with the first. *Id*. at 615. In a concurrence, however, Justice Kennedy more narrowly held that the more permissive approach described in *Elstad* should apply unless a two-step interrogation approach was used in a "calculated" and "deliberate" way. *Id*. at 622 (Kennedy, J., concurring). Unfortunately, federal courts of appeals, including the Tenth Circuit, have struggled to decide which of the two *Seibert* opinions is controlling and precedential. See *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1151 (10th Cir. 2006) (stating that it is "not easy" to determine the controlling opinion in *Seibert* and applying both the plurality and concurrence tests).

Despite the confusion over the proper legal standard, the Court finds that Mr. Mirabal's warned statements to SA Sainato are admissible under either test. Applying the factors from the *Seibert* plurality, the record shows that to the extent Mr. Mirabal was questioned at all before his *Mirandized* statement to SA Sainato, the "first round" of questions and answers was limited and undetailed (SA Sainato testified, for example, that he did not ask Mr. Mirabal any questions before

the *Mirandized* statement, *see supra at* 10); although Mr. Mirabal was asked about the firearm by PPO Nagel prior to being asked about it again during his warned statement, there is no evidence that his statements were otherwise overlapping (there is no evidence, for example, that he was asked about the contents of the cell phone before being *Mirandized*); Mr. Mirabal's second statement came immediately after any initial statements he made; there was discontinuity in the personnel asking the questions because PPO Nagel appears to have been the one asking the initial questions with SA Sainato taking over for the formal, warned statement; and the warned statement SA Sainato took appears to have been more of an interrogation based on the evidence the PPOs discovered in the apartment, including the pictures of Mr. Mirabal in the phone, than a continuation of an earlier round of questioning. *Seibert*, 542 U.S. at 615. The Court believes that these factors do not point to a "strategy adapted to undermine the *Miranda* warnings," *id.*, because there is little evidence of parallel questioning (or much questioning at all) before Mr. Mirabal was warned and then formally questioned by SA Sainato. For the same reason, the Court finds that Mr. Mirabal's argument also fails under Justice Kennedy's narrower approach because there is no evidence that the officers engaged in a "calculated" and "deliberate" two-step interrogation and because the Court has already found that Mr. Mirabal's statements were voluntary, eliminating any concerns under *Elstad*. *Seibert*, 542 U.S. at 622. The government will accordingly be permitted to introduce the statements Mr. Mirabal made to SA Sainato after SA Sainato administered the *Miranda* warnings notwithstanding Mr. Mirabal's earlier unwarned statements.[9]

---

[9] The Court also finds that Mr. Mirabal knowingly, voluntarily, and intelligently waived his right to remain silent under *Miranda*. *See United States v. Smith*, 606 F.3d 1270, 1276 (10th Cir. 2010). SA Sainato testified that he knows the *Miranda* warnings and has a card containing them in his wallet; that he knows how to give them and had given them prior to August 6, 2018; and that he in fact gave Mr. Mirabal the *Miranda* warnings on the day of the search. *See* Hearing Tr. at 149:10–21. SA Sainato further testified that after receiving the *Miranda* warnings, Mr. Mirabal agreed to speak with him. *Id.* at 149:22–24. Given SA Sainato's testimony and the lack of evidence that Mr. Mirabal failed to understand the warnings or was otherwise coerced into speaking, the Court finds that he validly waived his rights under *Miranda*.

## CONCLUSION

For the reasons set forth above, the Court finds that the PPOs had reasonable suspicion to support their search of Mr. Mirabal's apartment and phone pursuant to his orders of probation and parole. The Court also finds that Mr. Mirabal's temporary detention in handcuffs during the search was reasonable under the prevailing caselaw. The PPOs therefore did not violate Mr. Mirabal's Fourth Amendment rights and the physical evidence they discovered will not be suppressed. The Court also finds that Mr. Mirabal's statements during and after the search were voluntary under the Due Process Clause, and that his warned statements to SA Sainato after the search was complete are admissible under *Miranda*. The Court will suppress any statements Mr. Mirabal made in response to police questioning while he was in handcuffs *before* being given the *Miranda* warnings, however, because he was in custody at that time for the purposes of *Miranda* and the public safety exception from *Quarles* did not apply. Mr. Mirabal's Opposed Motion to Suppress Statements [Doc. 37] is accordingly **GRANTED IN PART** in accordance with this order. His Opposed Motion to Suppress Illegal Search [Doc. 38] is hereby **DENIED**.

Dated this 15th day of December, 2020.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE